

FILED

2023 Jan-26  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

PRESTON WARE and      )
ERIC WARE,      )
     )
       **Plaintiffs,**      )
     )    **Case No. 3:21-cv-1281-LCB**
**v.**      )
     )
**COLUMBUS LIFE INSURANCE**      )
**COMPANY,**      )
     )
       **Defendant.**      )

## OPINION & ORDER

Plaintiffs Preston and Eric Ware—father and son, respectively—filed this action in state court on August 20, 2021,[1] and Defendant Columbus Life Insurance Company timely filed its notice of removal here.[2] In short, the Wares allege that by terminating Preston's life-insurance coverage, Columbus ran afoul of the parties' agreement.[3] Before the Court is Columbus's Motion for Summary Judgment;[4] for the forthcoming reasons, the Court **GRANTS** the Motion in full and, accordingly, **DISMISSES** this action with prejudice.

---

[1] Circuit Court of Colbert County, Alabama, 10-CV-2021-900182. Doc. 1-1 at 2–7.

[2] Doc. 1 (filed Sept. 23, 2021).

[3] The Wares initially sought relief for breach of contract (Count I) and bad-faith cancellation (Count II) but now concede that Count II has no basis in Alabama law and is due for adverse summary judgment. Pls.' Resp., Doc. 22 at 9.

[4] Doc. 19; *see also* Def.'s Br., Doc. 21; Pls.' Resp., Doc. 22; Def.'s Reply, Doc. 23.

# I.   FACTUAL BACKGROUND

The Wares base their claim for relief—and Columbus, its Motion—on the following undisputed facts.

## A.   The Policy's Terms

Columbus issued life-insurance policy CM2043958U to Preston Ware on June 11, 1986.[5] The cost of coverage was, by the Policy's terms, determined on a monthly basis and was subject to upward variance in relation to Columbus's "expectations as to future mortality."[6] In other words, the requisite minimum for monthly premiums increased with the passage of time.[7] For this "Flexible Premium Adjustable" life-insurance policy, Preston was able to "choose the amount and frequency of [premium] payments."[8]

The amount and frequency Preston selected for those payments had a direct effect on what the Policy called "cash value."[9] "Cash value" was formulaically defined[10] within the Policy: On a given monthly "anniversary" date (here, the 11th of each month), the Policy's cash value equaled (1) "the cash value on the preceding monthly anniversary day,"[11] plus (2) "90 percent of all premiums (except the first)

---

[5] Doc. 21-1 at 12.
[6] *Id.* at 23.
[7] *Id.* at 18, 23.
[8] *Id.* at 12, 21.
[9] *Id.* at 21.
[10] *Id.* at 23.
[11] *Id.* (including interest at a monthly compounding rate of 0.36748%).

received since the preceding monthly anniversary day," minus (3) the next month's cost of insurance.[12] Stated simply, the preceding anniversary date's cash value, coupled with 90% of all premiums (except the first) subsequently paid, was required to be at least equal to the next month's coverage cost.[13] Insufficient cash value on a monthly anniversary date triggered a 61-day "grace period," during which the Policy permitted retroactive cash-value rectification.[14] Columbus also sent annual reports indicating, among other things, the Policy's cash value.[15]

The Wares typically paid monthly premiums by way of preauthorized automatic withdrawal ("PAW") from the checking account on file. An increase in coverage costs unaccompanied by a corresponding PAW adjustment inherently depleted the Policy's cash value.[16]

The Policy set forth two absolute prerequisites for automatic termination without value.[17] The first was the insured's failure to reestablish a sufficient cash value for the duration of a grace period.[18] The second was Columbus's provision of a "grace notice" via mail.[19] Columbus would "not terminate [the] policy until 31

---

[12] *Id.* Also deducted from (1) and (2) in the cash-value calculation above was a small monthly expense charge, which has no bearing on this case. *Id.* at 12, 23.
[13] *Id.* at 23.
[14] *Id.* at 22–23.
[15] *Id.* at 21 (Policy provision promising annual report); *see also id.* at 64–67, 92–95, 126–29 (annual reports).
[16] *Id.* at 21.
[17] *Id.* at 22.
[18] *Id.*
[19] *Id.* at 23.

days after" mailing notice to "the last known address" *even if* a 61-day grace period had already run to completion.[20]

Between 2010 and 2015, Columbus sent six grace notices to Preston.[21] Each time, Preston remitted the minimum payments necessary to rectify the deficient cash value and maintain coverage before automatic termination.[22] In October 2015, Preston directed all further Policy related correspondence to Eric's residential address ("Golfview address").[23]

### B.   <u>2016 to 2018</u>

On August 10, 2016, Columbus mailed a grace notice to the Golfview address requesting payment of at least $21.46 by September 10th.[24] The July 11 PAW had been insufficient to maintain a cash value equaling or exceeding the cost of August's coverage and thus triggered a 61-day grace period.[25] To that end—due to the increase in coverage costs—the notice stated that the Wares' $245.22 PAW was "not sufficient to keep [the] policy in force," that the insufficient PAWs had been temporarily halted, and that, moving forward, a PAW of at least $261.46 was

---

[20] *Id.* For example, if Columbus sent "grace notice" via mail on the 60th day of a 61-day grace period, then Preston would have 31 days from the mailing of such notice (or, stated differently, 91 days from the grace period's commencement) to rectify the deficient cash value.
[21] *Id.* at 53–59.
[22] *Id.* at 46–51.
[23] *Id.* at 66.
[24] *Id.* at 69–70.
[25] *See id.* at 69.

necessary to maintain coverage at the current monthly rate.[26] Columbus ultimately received the minimum payment necessary to rectify the July 11 cash value before the September 10 deadline.[27] Thus, the July 11 grace period referenced in the August 10 notice did not lead to termination.

Despite rectifying the deficient July 11 cash value, the $21.46 premium did nothing for the August 11 cash-value calculation, which restarted the 61-day timer.[28] And because the Wares had paid nothing beyond $21.46 since the July PAW,[29] Columbus sent to the Golfview address another grace notice on September 12, 2016.[30] The September notice described the minimum payment necessary to prevent lapse on October 13, 2016.[31] Preston called Columbus to discuss the situation on September 21, and Columbus's employee explained, as did the August and September notices, that the $245.22 PAWs were insufficient to maintain coverage at the current rate.[32] Nine days later, Columbus received the requested premium, which retroactively established a satisfactory cash value for purposes of both the August 11 and September 11 anniversary dates.[33] The following month, Preston sent

---

[26] *Id.*
[27] *Id.* at 47.
[28] *See* Telephone Tr. (July 3, 2018), *id.* at 102 (noting that Wares were behind on payments and that payments were being attributed to "the month behind" due to insufficient cash value, in nearly identical circumstances).
[29] *Id.* at 46–47 (detailing premium-payment history).
[30] *Id.* at 72–73.
[31] *Id.* at 72. The September 2016 notice also mentioned temporary cessation of PAWs. *Id.*
[32] *See* Telephone Tr. (Sept. 21, 2016), *id.* at 82.
[33] *See id.* at 47.

Columbus a letter directing all future correspondence to Eric at a new address ("Cottonwood address") and also instructed deduction of all future PAWs from Eric's bank account.[34]

Columbus sent a grace notice to Eric at the Cottonwood address on July 11, 2018. The notice stated that coverage would lapse unless Columbus received $318.72 within 31 days.[35] Eric subsequently phoned Columbus about the notice; he agreed to pay the requested premium and to increase future PAWs to $308.88—the minimum amount necessary to keep the Policy afloat until coverage costs rose again.[36] Eric also updated his address ("Muscle Shoals address").[37]

## C.  <u>2020 to Present</u>

After receiving the Wares' $308.88 PAW on June 9, 2020, Columbus mailed its annual report to the Muscle Shoals address on June 11.[38] The report showed that the Policy had entered a grace period on June 11 in light of a deficient $21.71 cash value.[39] And though Columbus subsequently received the Wares' $308.88 PAW on

---

[34] *Id.* at 89–90.

[35] *Id.* at 112.

[36] Telephone Tr. (July 19, 2018), *id.* at 120–23. As did previous grace notices, the July 2018 notice informed the Wares that PAWs had been discontinued and that a bare-minimum PAW increase would suffice only for purposes of the current monthly coverage rate. *Id.* at 112.

[37] *Id.* at 122.

[38] *Id.* at 126; *see also id.* at 21 (Policy provision regarding annual report).

[39] *Id.* at 126 (2020 Annual Report). Plaintiffs assert that according to the 2020 Annual Report, "on May 11, 2020, the cash value stood at $21.71" but that Plaintiffs "are not in possession of the cash value of the policy in June, July, or August 2020." Pl.'s Br., Doc. 22 at 8. But the Report clearly shows a $21.71 cash value "as of 6/11/2020." Doc. 21-1 at 126. To the extent Plaintiffs intentionally assert otherwise, they have created no genuine factual dispute for purposes of summary judgment.

July 9,[40] the monthly cost of coverage had increased such that the PAW fell short of rectifying the June 11 cash value (i.e., of exiting the grace period).[41] Columbus accordingly mailed notice ("the Final Notice") to the same address on July 13, informing the Wares of the grace period's commencement and of the temporary pause on PAWs, which required increasing in order to keep pace with the updated cost of coverage.[42]

In the Final Notice, Columbus demanded payment, by August 13, of at least $394.27, the minimum necessary to avoid lapse—i.e., to retroactively establish sufficient cash value for purposes of the foregone June and July anniversary dates.[43] But Columbus received no such payment, so, as promised in the Final Notice, coverage automatically terminated on August 13, 2020. The Wares do not dispute Columbus's mailing of the Final Notice but do allege that they never received it.[44]

## II.   LEGAL STANDARD

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). To obtain summary judgment, the movant must demonstrate that all material facts are undisputed and

---

[40] *Id.* at 50.
[41] *See id.* at 131; *see also id.* at 23 (providing formula for calculation of cash value).
[42] *Id.* at 131.
[43] *Id.*
[44] Eric Ware Dep., Doc. 21-3 at 14–15; Pls.' Br., Doc. 22 at 6; *see also* Doc. 21-2 at 10–14 (direct evidence of delivery).

entitle him to a judgment on the merits. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). That burden requires the movant to point out portions of the record or pleadings that justify summary judgment. FED. R. CIV. P. 56(a).

"[B]ut the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Liberty Lobby*, 477 U.S. at 256. A party's opposition to summary judgment "may not rest upon the mere allegations or denials of his pleading"; it "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (citing FED. R. CIV. P. 56(e)). To that end, evidence that "is merely colorable" or otherwise "is not significantly probative" cannot create a jury question. *Id.* at 249 (citations omitted).

Applicable substantive law distinguishes the material from the immaterial. *Id.* And there can be "no genuine issue as to any material fact" where the nonmovant is unable, after adequate discovery, to "make a showing sufficient to establish the existence of an element essential to [its] case" under the applicable substantive law. *Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990) (citations omitted). Dispensing with just one legal element of the non-movant's claim "necessarily renders all other facts immaterial," in which case "the plain language of Rule 56(c) mandates the entry of summary judgment." *Celotex*, 477 U.S. at 322.

The trial court's inquiry turns upon "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one

party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52. In engaging with that inquiry, the court is "required to view the evidence and all factual inferences therefrom in the light most favorable to [the nonmovant] and to resolve all reasonable doubts about the facts in her favor." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1341 (11th Cir. 2022) (citation omitted). Should "conflicts arise between the facts evidenced by the parties," the court "must credit the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) (citation omitted).

## III.   DISCUSSION

General contract law[45] governs insurance disputes. *Pate v. Rollison Logging Equip., Inc.*, 628 So.2d 337, 345 (Ala. 1993). And recovery on a claim for breach requires the plaintiff to prove "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Ex parte Coleman*, 861 So.2d 1080, 1085 (Ala. 2003) (citation omitted).

Columbus's quest for summary judgment demands demonstration, to the exclusion of any reasonable factual dispute, that the Policy unambiguously authorized its conduct. And the sole issue here is whether termination of Preston's

---

[45] The parties agree upon the application of Alabama law in this case. Def.'s Br., Doc. 20 at 15 n.4; Pls.' Resp., Doc. 22 at 4.

life-insurance coverage amounted to nonperformance.[46] For the forthcoming

reasons, the Court finds that Columbus complied with the Policy's clear terms.

### A.  The Policy is not ambiguous.

Plaintiffs argue in their brief that the Policy is ambiguous. More specifically,

Plaintiffs state—in conclusory fashion[47]—that Columbus's "actions and

representations" rendered the Policy's language susceptible to more than one

objectively reasonable interpretation.[48]

Whether ambiguity exists, the "threshold issue" in contract litigation, "is for

the trial court to determine." *Cherokee Farms, Inc. v. Fireman's Fund Ins. Co.*, 526

So.2d 871, 873 (Ala. 1988); *accord Gen. Motors Acceptance Corp. v. Dubose*, 834

So.2d 67, 72 (Ala. 2002) (per curiam). An objective affair, the trial court's task is

wholly unaffected by the parties' proffered interpretations. *Twin City Fire Ins. Co.*

*v. Alfa Mut. Ins. Co.*, 817 So.2d 687, 692 (Ala. 2001) ("The fact that the parties

interpret the insurance policy differently does not make the insurance policy

ambiguous.") (citation omitted). Notwithstanding any disagreement between the

parties, "[a]mbiguities will not be inserted, by strained and twisted reasoning, into

contracts where no such ambiguities exist." *Ala. Farm Bureau Mut. Cas. Ins. Co. v.*

---

[46] Doc. 20 at 15.

[47] Doc. 22 at 5 ("Through its own actions and representations, the Defendant made the interpretation and application of material provisions in its policy susceptible to more than one interpretation and therefore ambiguous. For the purposes of summary judgment, those ambiguities should be resolved in favor of the Wares and summary judgment denied.")

[48] Doc. 22 at 5.

*Goodman*, 188 So.2d 268, 270 (Ala. 1966) (citing *Mich. Mut. Liab. Co. v. Carroll*, 123 So.2d 920 (Ala. 1960)).

Instead, the court must "apply the common interpretation of the language alleged to be ambiguous," presuming all the while "that the parties intended what the terms of the agreement clearly state. *Porterfield v. Audubon Indem. Co.*, 856 So.2d 789, 799 (Ala. 2002) (citing *Ala. Farm*, 188 So.2d at 270); *Dawkins v. Walker*, 794 So.2d 333, 339 (Ala. 2001) (citations omitted). And if those intentions are clearly ascertainable, there exists "no question of interpretation" for the court's resolution. *Twin City Fire*, 817 So.2d at 692 (citing *Am. & Foreign Ins. Co. v. Tee Jays Mfg. Co.*, 699 So.2d 1226 (Ala. 1997)); *see also Dunlap v. Macke*, 171 So. 721, 724 (Ala. 1937) (recalling "familiar law"). In those instances, "the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary judgment." *Reeves Cedarhurst Dev. Corp. v. First Amfed Corp.*, 607 So.2d 184, 186 (Ala. 1992); *cf. Kelmor, LLC v. Ala. Dynamics, Inc.*, 20 So.3d 783, 790 (Ala. 2009) (noting that jury determines meaning of language deemed ambiguous by trial court) (citation omitted).

Ambiguity does come, however, in either of two distinct flavors: patent or latent. *Jacoway v. Brittain*, 360 So.2d 306, 308 (Ala. 1978).

i.    <u>Patent Ambiguity</u>

While resolving the threshold issue in most cases—those concerning patent ambiguity—the trial court "will not look beyond the 'four corners of the instrument.'" *Gotlieb v. Klotzman*, 369 So.2d 798, 800 (Ala. 1979) (citations omitted); *accord Kershaw v. Kershaw*, 848 So.2d 942, 955 (Ala. 2002). The presence of patent ambiguity hinges solely upon whether more than "one reasonable meaning clearly emerges" from the instrument. *See Dubose*, 834 So.2d at 72 (quoting *Sealing Equip. Prods. Co. v. Velarde*, 644 So.2d 904, 908 (Ala. 1994)).

Here, the Policy presents no facial, or "patent," ambiguity; that is, its terms are not apparently susceptible to competing interpretations. The Policy contains a formulaic calculation of "cash value." In turn, the Policy articulates—by reference to cash value—the requirements for maintenance of coverage and the prerequisites for termination. The parties' actions and beliefs have no bearing on the Court's determination about the presence of a patent ambiguity, and the Court is unable to locate any unclear language in the Policy.

ii.    <u>Latent Ambiguity</u>

To be sure, some written agreements contain what courts have termed "latent" ambiguity or, in other words, contractual language that reads quite clearly but that nonetheless reasonably lends itself to conflicting constructions in a particular case. *Thomas v. Principal Fin. Grp.*, 566 So.2d 735, 739 (Ala. 1990). This too presents a

question of law for the trial court, in answering which the court may consider parol evidence to determine whether latent ambiguity permeates the parties' agreement. *Mass Appraisal Servs., Inc. v. Carmichael*, 404 So.2d 666, 673 (Ala. 1981). That is, a court may look beyond the instrument—to surrounding factual context—for aid in deciding whether the parties based entry into the agreement upon a material provision that, despite its facial unambiguity, reasonably lent itself to disparate application in the context of performance. *Id.*

No latent ambiguity exists here. The Wares merely allege that Columbus's "actions and representations" rendered the Policy's clear language contextually ambiguous. More specifically, the Wares attempt to persuade the Court that "cash value" (defined by calculative formula in the Policy) and "grace notice" (of which the Wares received nine from 2010-2018 and, each time, responded with appropriate payment) are rendered ambiguous by the following conduct: (1) Columbus's willingness, stated in the July 13, 2020 Final Notice, to accept what the Wares call a "technically late" August 13 premium; and (2) Columbus's acceptance of the July 9 PAW and subsequent discontinuance of PAWs "without authorization," as had been done in each aforementioned grace period (and described in each grace notice, including the Final Notice).

For starters, the Court does not accept the argument that Columbus's willingness to accept what Plaintiffs term a "technically late" policy-preserving

payment lends the Policy's otherwise-clear text to conflicting application here. But Plaintiffs' argument for ambiguity on those grounds is not persuasive: The Policy unequivocally forbade termination prior to 31 days from the mailing of a grace notice. Columbus did not mail the Final Notice until July 13, 2020, so coverage could terminate no sooner than August 13. By the Policy's language, payment on or before that date would not have been too "late" to prevent termination, though any grace-period payment could perhaps be considered "late" in some colloquial sense.

Second, acceptance of the July 9 PAW preceded the July 11 cash-value calculation, at which time the grace period had been running for over a month (and following which Columbus mailed the Final Notice). As provided for in all aforementioned grace notices, PAWs were halted upon issuance of the Final Notice. Moreover, the parties' decades-long history illustrates quite clearly that, contrary to the Wares' contention, Columbus acted customarily in pausing PAWs upon issuance of written grace notice; had PAW cancellation rendered the Policy ambiguous, an issue would almost certainly have arisen in years prior.

Nor does this case resemble, in any sense, the sort in which courts find that an apparently unequivocal contractual provision *actually* substantiates disparate,

reasonable interpretations in context.[49] Nothing here suggests that the parties held reasonable yet fundamentally distinct understandings about a provision that otherwise appears clear on its face. Plaintiffs' singular, conclusory statement about the Policy's "subject[ion] to more than one interpretation" cannot persuade the Court to insert additional criteria into a facially unambiguous Policy that, for the reasons below, causes no confusion in application here.

The precise manner in which the Wares believe that the conduct here rendered the plainly worded Policy nevertheless ambiguous remains a mystery. Their brief

---

[49] A latent ambiguity "appears only as the result of extrinsic or collateral evidence showing that a word, thought to have but one meaning, actually has two or more meanings." *Meyer v. Meyer*, 952 So.2d 384, 392 (Ala. Civ. App. 2006) (quoting 11 *Williston on Contracts* § 33:40). Classic first-year law school cases like *Raffles v. Wichelhaus*—the case of the two ships *Peerless*—illustrate situations in which a latent ambiguity is said to exist. *Id.* (citation omitted). "It is when parties agree to terms that reasonably appear to each [party] to be unequivocal but are not, cases like that of the ship *Peerless* where the ambiguity is buried," that a latent ambiguity emerges. *Colfax Envelope Corp. v. Loc. No. 458-3M Chi. Graphic Commc'ns*, 20 F.3d 750, 754 (7th Cir. 1994) (Posner, C.J.). In *Raffles*, 159 Eng. Rep. 375 (1864), the parties contracted for the shipment of cotton by way of the ship "Peerless" but later found out that two ships bore the moniker and, accordingly, that use of the seemingly unambiguous term actually resulted from a material misunderstanding at the outset and became clear only in the context of performance. *Id.*; *see also, e.g.*, *Smith v. Aikin*, 75 Ala. 209, 210 (1883) (holding that contract for sawed lumber "at the price of two dollars per thousand feet" contained latent ambiguity because two milling-industry methods of measurement existed and rendered uncertain by which method the "thousand feet" were to be measured); *id.* at 213 ("Is it two dollars per thousand feet of sawed lumber, or two dollars per thousand feet of logs sawed into lumber?"); *Oswald v. Allen*, 417 F.2d 43, 45 (2d Cir. 1969) (concerning agreement between parties for the purchase of the "Swiss Coin Collection," specifically the ambiguity regarding the contents of the "Swiss Coin Collection," where (1) seller showed buyer of that collection various Swiss coins before contracting, only some of which belonged to the "Swiss Coin Collection" while others, despite Swiss origin, actually belonged to the "Rarity Coin Collection"; (2) neither party realized that the purchaser (reasonably) believed references to "Swiss coins" and "Swiss Coin Collection" to have included not all coins from Switzerland but only a specific subset of the Swiss coins in seller's inventory; and (3) to make matters worse, the parties spoke different languages, a fact that played a large hand in the latent ambiguity's genesis).

simply does not allege specific facts in this regard. To be sure: Whether the Policy barred termination on August 13 is a question of contractual *construction*, not interpretation. But as for the threshold issue, the Court has been presented with no argument or extrinsic evidence upon which it can plausibly base an ambiguity finding.

### B.   Columbus did not breach the agreement.

Plaintiffs correctly contend that "where there is any doubt as to whether an insurance policy provides coverage . . . courts must construe the policy language for the benefit of the insured."[50] But "it is equally well settled that," absent ambiguity, "courts must enforce insurance contracts as written and cannot defeat" express terms "by making a new contract for the parties." *St. Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Ctr.*, 595 So.2d 1375, 1377 (Ala. 1992) (citation omitted). And "only clauses which are uncertain"—that is, clauses the court has found unclear as a matter of law—are "construed favorably to the insured." *Ala. Farm*, 188 So.2d at 270 (citations omitted).

In that vein, courts are forbidden to "refin[e] away the terms of a contract expressed with sufficient clearness to convey the intent and meaning of the contracting parties" or to otherwise "rewrite" or "distort" written agreements "under

---

[50] Doc. 22 at 5 (citing *St. Paul Mercury Uns. Co. v. Chilton-Shelby Mental Health Ctr.*, 595 So.2d 1375, 1377 (Ala. 1992)).

the guise of judicial construction." *Northam*, 163 So. at 636 (citations omitted) *accord Ala. Farm*, 188 So.2d at 270 (noting that courts have "no right to add anything . . . or to take anything from" plainly written agreements).[51] A court must instead "take the words of an insurance policy as they are found in it." *Ala. Farm*, 188 So.2d at 270 (citations omitted).

Insurers "have the same rights as individuals to limit their liability" by "impos[ing] whatever conditions they please upon their obligations." *Id.*; *accord Chilton-Shelby*, 595 So.2d at 1377 ("[I]nsurers have the right to limit their liability by writing policies with narrow coverage."). And when an insurer establishes bounds for its liability with "plain and unambiguous" policy language, "courts have no right to stray into the mazes of conjecture or to search for an imaginary purpose." *Babcock v. Smith*, 234 So.2d 573, 562 (Ala. 1970) (quoting *Hattemer v. State Tax Comm'n*, 177 So. 156, 158 (Ala. 1937)). Perhaps most importantly, "[w]here an insurance policy defines certain words or phrases, a court must defer to the definition provided by the policy." *Twin City Fire*, 817 So.2d at 692 (citing *St. Paul Fire & Marine Ins. Co. v. Edge Mem'l Hosp.*, 584 So.2d 1316 (Ala. 1991)).

This entire dispute concerns whether the Policy was in fact subject to automatic cancellation by its own terms on August 13, 2020. If Plaintiffs failed to

---

[51] first citing *Life & Cas. Ins. Co. v. Whitehurst*, 148 So. 164 (1933); and then citing *Shinn v. Fam. Rsrv. Ins. Co.*, 33 So.2d 741 (Ala. App. 1947).

meet the requirements for maintenance of coverage and Columbus complied with all Policy prerequisites before coverage terminated, then Columbus is due summary judgment.

The Wares allege that that the parties' history indicates "that simply calling the Wares to tell them that they were discontinuing [PAWs] would have led to a swift resolution of the issue."[52] But two specific prerequisites—grace period and notice—existed with respect to termination for insufficient cash value. Nothing in the Policy required Columbus, atop both a 61-day grace period and 31-day written notice, to attempt additional notification of looming termination. The Court will not retroactively impose upon Columbus additional duties not found within the Policy's four corners. Columbus did not terminate coverage prior to the passage of both 61 days from entry into a grace period and 31 days from provision of a grace notice.

And nothing in the Policy forbade Columbus from temporarily discontinuing PAWs. This Court's refusal to find breach on those grounds is not novel. In *Haupt v. Midland National Life Insurance Co.*, the Alabama Supreme Court held that the insured's failure to pay premiums required by the policy was not excused by PAW failure. 567 So.2d 1319, 1321 (Ala. 1990) (noting that the plaintiff's "choice of the automatic withdrawal payment should not and cannot relieve him of his duty to remit his premium payment"). "To be sure," the court noted, "the general rule in Alabama

---

[52] Doc. 22 at 6.

is that failure to pay the premium on a life insurance contract does not of itself forfeit the contract." *Id.* (citing *Grimes v. Liberty Nat'l Life Ins. Co.*, 551 So.2d 329, 322 (Ala. 1989)). If, however, "that failure to pay the premium causes the contract to end, then the insured is contractually bound either to pay the premiums or lose the coverage." *Id.* (citing *Grimes*, 551 So.2d at 322). In so holding, the court reasoned that allowing the plaintiff "to accept the benefits of the policy without paying the premiums would allow [the plaintiff] to receive the benefit of the bargain at no cost." *Id.* (reasoning also that "if it was necessary as a practical matter for the [plaintiffs] to check the bank statement" for purposes of ensuring payment, "that is not an onerous or unreasonable burden to place on them"); *see also Floyd v. Allstate Ins. Co.*, 989 F. Supp. 1435, 1440 (M.D. Ala. 1998) (noting that "Plaintiff cannot argue that her premium was unpaid because she was 'unaware'").

As previously discussed, the Policy provided for automatic termination upon failure to remit payment that the Policy deemed both sufficient in quantity and timely in nature. Plaintiffs' failure to pay did not *itself* justify termination of coverage, but the Policy's language did. As such, Plaintiffs cannot argue that termination for nonpayment was improper because they were unaware of the discontinued PAWs.

Moreover, Plaintiffs' allegedly never having received the Final Notice cannot save them from summary judgment. Alabama law precludes Plaintiffs from crafting a jury question in this case by mere denial of receipt, without more and without

disputing the authenticity of Defendant's direct evidence[53] of delivery. *Sisson v. State Farm Fire & Cas. Co.*, 824 So.2d 708, 710–11 (Ala. 2001) (answering this Court's certified question). "Where proof of mailing of a notice under an insurance policy is established by evidence of a definite and specific character," summary judgment is not improper "if the only countervailing evidence is the insured's denial of receipt." *Id.* at 710; *cf. Ex parte Alfa Mut. Gen. Ins. Co.*, 742 So.2d 182 (Ala. 1999) (finding fact issue from denial where only proof of mailing came from testimony of insurer's employee). *See also Alfa Mut.*, 742 So.2d at 187 (requiring proof "of a definite and specific character"); *Am. Interstate Ins. Co. v. Kelley*, 797 So.2d 479, 482 (Ala. Civ. App. 2000) (same). "If the United States District Court is satisfied as to the existence of an authentic certificate that could have been issued only by the United States Postal Service[54] and not created by employees of [the insurer] . . . the insured's denial of receipt of a notice of policy cancellation or nonrenewal does not create an issue of fact as to the mailing of the notice." *Sisson*, 824 So.2d at 711. Here, Defendant has provided ample, objective proof.[55] And like in *Sisson*, the Wares do not dispute the proof-of-delivery's authenticity. 824 So.2d

---

[53] Doc. 21-2 at 10–14.

[54] That Defendant's proof of delivery comes from United Mail (which provides sorting services before placement of mail into USPS) is no reason to distinguish the case from *Sisson*. Unlike *Alfa Mutual*, *supra*, where the proof of mailing came only from the testimony of insurer's employee, Columbus's evidence is both direct and objective.

[55] *See* Doc. 21-2 at 10–14.

at 708; *see also Sullivan v. E. Health Sys., Inc.*, 953 So.2d 355, 360 n.6 (reaching conclusion on other grounds but nonetheless recognizing *Sisson* in dicta).

In sum, Columbus has demonstrated the nonexistence of any reasonable factual basis for arguing that termination of the Wares' coverage contravened the Policy's unambiguous terms. Columbus permitted the requisite grace period and issued the requisite grace notice, and the Policy terminated automatically—by its own terms—upon Plaintiffs' failure to rectify the deficient cash value.

## IV. CONCLUSION

Having construed all reasonable factual disputes in Plaintiffs' favor but nonetheless found that Columbus's conduct in no way ran afoul of the Policy's unambiguous terms, the Court finds that Plaintiffs are unable to survive summary judgment here. The Court accordingly **GRANTS** Columbus's Motion for Summary Judgment (Doc. 19) and **DISMISSES** Counts I and II with prejudice.

**DONE** and **ORDERED** January 26, 2023.

**LILES C. BURKE**
**UNITED STATES DISTRICT JUDGE**